**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CHARLES FARDEN,

     Plaintiff,

v.                                    Civ. No. 23-851 KK/LF

UNITED STATES OF AMERICA,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

At issue in this suit under the Federal Tort Claims Act is whether the United States can be held liable for false imprisonment or false arrest when a federal law enforcement officer restrains or arrests a person whom he has probable cause to believe is committing the federal crime of marijuana cultivation on tribal land in New Mexico, even though such cultivation may be legal under state law. Because the Court answers this question in the negative, and because there are no genuine factual disputes regarding whether the officer in this case had such probable cause, the Court will GRANT Defendant the United States of America's Motion for Summary Judgment (Doc. 59) ("Motion"), as further explained below.

## I. Factual Background and Procedural History

On September 29, 2021, Bureau of Indian Affairs ("BIA") Officer Jonathan Vigil detained Plaintiff Charles Farden on the Picuris Pueblo ("Pueblo") in New Mexico.[1] (*See generally* Doc. 1). On September 28, 2023, Plaintiff filed suit against the United States and Officer Vigil based on the detention. (*Id.*). Plaintiff's complaint asserts: (1) assault, battery, false imprisonment, and false arrest claims against the United States under the Federal Tort Claims Act ("FTCA"); and, (2)

---

[1] Plaintiff is not an enrolled member of the Pueblo or any other tribal entity. (Doc. 1 at 1; Doc. 59-3 at 20).

*Bivens* claims against Officer Vigil alleging violations of the Fourth Amendment to the United States Constitution.[2] (*Id*. at 5-7).

On May 10, 2024, Officer Vigil filed a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c), arguing that Plaintiff had not asserted a cognizable *Bivens* claim. (Doc. 23). In response to the motion, Plaintiff voluntarily dismissed his *Bivens* claims against Officer Vigil. (Doc. 25). However, Plaintiff did not dismiss his FTCA claims against the United States. (*See id.*).

The United States filed the present Motion on May 16, 2025, arguing that it is entitled to summary judgment on Plaintiff's FTCA claims against it. (Doc. 59). In his response to the Motion, Plaintiff states that he "does not oppose entry of summary judgment in favor of Defendant with respect to [his] claim for battery/excessive force" but does oppose Defendant's request for summary judgment on his "[f]alse [a]rrest" claim. (Doc. 61 at 1, 5). Plaintiff makes no mention of his false imprisonment claim or his assault claim. (*See generally id.*). Moreover, although Plaintiff's arguments in opposition to Defendant's request for summary judgment on his false arrest claim can be construed to apply to his false imprisonment claim as well, none of his arguments can be construed to oppose Defendant's request for summary judgment on his assault claim. (*Id.*). Thus, the Court will grant Defendant's request for summary judgment on Plaintiff's assault claim as well as his battery claim because Plaintiff has not opposed that request. The Court addresses the parties' substantive arguments in deciding whether to grant summary judgment on Plaintiff's false imprisonment and false arrest claims.

---

[2] *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (recognizing cause of action for money damages against federal law enforcement officers for certain Fourth Amendment violations).

## II. **Material Facts**

Except as otherwise noted, the parties do not dispute the following facts. On September 22, 2021, BIA Officer Thelma Yellow Kidney drove her marked patrol vehicle to 80 Buffalo Trail Road, which is on the Pueblo, to serve an arrest warrant. (Doc. 59-2 at 1). Plaintiff resides east of 80 Buffalo Trail Road at 113 Buffalo Trail Road. (Doc. 59-3 at 3, 11, 15).

When Officer Yellow Kidney arrived at 80 Trail Buffalo Road, she smelled "an overwhelming odor of marijuana outside." (Doc. 59-2 at 1). However, when she stepped inside the residence to serve the arrest warrant, the odor was "no longer present." (*Id.*). She asked the subject of the warrant if he grew marijuana and he "responded he did not." (*Id.*). After arresting the subject, she walked back outside, where she noticed "the marijuana odor coming from the east end of Buffalo Trail Road." (*Id.*). She walked around the driveway of the residence and "to the east end of the yard" but could not locate the odor's source.[3] (*Id.*).

The next evening, Officer Yellow Kidney drove back to 80 Buffalo Trail Road, where she again noticed an "overwhelming odor of marijuana east of the residence." (*Id.*). Officer Yellow Kidney tried to drive further east on Buffalo Trail Road but three vehicles were blocking the road, so she returned to her office. (*Id.* at 1-2). Upon arriving there, she informed Officer Vigil that there was "possible marijuana cultivation" on the Pueblo. (*Id.*). Specifically, she told Officer Vigil "that it was east of residence number 80. That's where she kind of thought that the odor was coming

---

[3] At his deposition, Plaintiff testified that his neighbor who was arrested "had cannabis growing right there" and that this was what Officer Yellow Kidney smelled because "the wind doesn't blow from the east to the west there." (Doc. 59-3 at 11). However, Plaintiff has not shown that he has any personal or expert knowledge regarding which way the wind was blowing at his neighbor's residence at the time of the arrest. On the contrary, he admitted that he was not present or "anywhere close" to the scene of the arrest at the time. (*Id.*) Thus, his testimony is not cognizable to contradict Officer Yellow Kidney's attestation that she perceived the odor to be coming from the east end of Buffalo Trail Road. Also, Plaintiff's testimony wholly fails to contradict that Officer Yellow Kidney reported her perception to Officer Vigil, nor does it supply any reason why Officer Vigil should have questioned her report.

from. Off of Buffalo Trail Road." (Doc. 59-1 at 5). At the time, the BIA employed Officer Vigil as a "Division of Drug Enforcement (DDE) K-9 officer." (Doc. 59-1 at 3; Doc. 59-2 at 2).

On September 29, 2021, six days after Officer Yellow Kidney informed him of the marijuana odor emanating from Buffalo Trail Road, Officer Vigil drove his marked patrol vehicle to the area to follow up on the information. (Doc. 59-1 at 4, 14). He turned east onto Buffalo Trail Road at approximately 11:30 a.m. and detected an odor of marijuana in the same area Officer Yellow Kidney had. (*Id.*).

Here, the parties' versions of events briefly diverge. Defendant relies on Officer Vigil's deposition testimony to the following facts. (Doc. 59 at 3-4). As Officer Vigil continued eastward, he observed a partially fenced enclosure in a field and an individual later identified as Plaintiff inside the enclosure. (Doc. 59-1 at 4, 6-7). Officer Vigil continued to drive east on Buffalo Trail Road until he reached the last residence on the road and turned around. (*Id*. at 4). As he headed west back down the road, he saw Plaintiff standing in the field close to the enclosure. (*Id*). When his vehicle was about 20 to 30 feet from the enclosure, he observed the tops of green leafy plants growing above the black tarp partially covering it. (*Id.*). From his training and experience, he recognized these plants as marijuana. (*Id*. at 2, 4, 6-7). At this point Officer Vigil decided to park his vehicle and approach Plaintiff. (*Id*. at 4, 6-7).

Plaintiff, in turn, relies on his deposition testimony to the following facts to challenge Officer Vigil's testimony. (Doc. 61 at 2). Officer Vigil could not have seen the field or the partially fenced enclosure from Buffalo Trail Road because the road is "about six feet lower than the field is," the enclosure was about 100 feet from the road, and in one area there were "a whole bunch of trees."[4] (Doc. 59-3 at 4). Officer Vigil used Plaintiff's driveway to turn around and must have seen

---

[4] However, photographs attached to Plaintiff's response to Defendant's Motion show that there are ample portions of the road where trees do not block the view of, or physical access to, the field. (*See* Doc. 61-1 at 1-3, 8-12).

Plaintiff's marijuana plants while in the driveway because "that was the only place you could actually see it from there, because we had taken all the corn down." (*Id*).

Returning to facts the parties do not dispute, the field in question was adjacent to Buffalo Trail Road, and "there hasn't been fencing around that field for probably over 60 years." (*Id.* at 4, 11). There were no posted signs or warnings to deter members of the public from entering the field. (Doc. 59-1 at 13; Doc. 59-3 at 4, 11). The partially fenced enclosure was located within the field, more than 300 to 400 hundred feet from Plaintiff's residence. (Doc. 59-3 at 3; Doc. 61-1 at 19). Viewed facing away from the road, the entrance to Plaintiff's driveway was immediately to the right of the field and was not fenced or gated. (Doc. 61-1 at 3-6, 13-19). Beyond the entrance, the driveway divided into two forks, with the left fork abutting the field and the right fork leading to 113 Buffalo Trail Road. (*Id.* at 19).

Dressed in uniform, Officer Vigil walked into the field, which enabled him to see marijuana plants growing in the partially fenced enclosure. (Doc. 59-1 at 6-7, 13-14; Doc. 59-3 at 9-10, 18; Docs. 59-4, 59-5). Plaintiff was in the field close to the enclosure. (Doc. 59-1 at 6; Doc. 59-3 at 4). Officer Vigil approached and spoke to him. (Doc. 59-1 at 7, 14; Doc. 59-3 at 4). "The first thing" Officer Vigil asked Plaintiff was "what are you growing?" (Doc. 59-3 at 4; *see also* Doc. 59-1 at 14). Plaintiff responded that he was growing vegetables and "medical cannabis." (*Id.* at 4-5). Officer Vigil understood this to be an admission that Plaintiff was growing marijuana in violation of federal law. (Doc. 59-1 at 15).

Officer Vigil asked Plaintiff if he had "a license for this," and Plaintiff produced his driver's license, New Mexico medical cannabis patient card, and New Mexico personal production license. (Doc. 59-1 at 12; Doc. 59-3 at 5-6); *see generally* N.M. Stat. Ann. §§ 26-2B-1 to 26-2B-10 (2021) (legalizing medical use of cannabis in some circumstances); *see also* N.M. Admin. Code §

7.34.4.21 (listing requirements for medical cannabis personal production license). Officer Vigil told Plaintiff that his patient card and production license were "no good" and he needed to come down to the officer's patrol vehicle. (Doc. 59-1 at 7; Doc. 59-3 at 5-6, 12). Plaintiff complied, and Plaintiff and Officer Vigil continued to converse outside the vehicle. (*Id.*).

Right before Officer Vigil handcuffed him, Plaintiff used his cellphone to call friends because he does not trust police officers. (Doc. 59-3 at 5-6, 8). Officer Vigil became concerned for his safety because he was detaining Plaintiff "pending a criminal investigation of cultivating marijuana," Plaintiff "was calling unknown individuals" and Officer Vigil "didn't know their actual intent," Officer Vigil was the sole officer at the scene, and the officer did not know if Plaintiff was armed. (Doc. 59-1 at 8, 15). Officer Vigil therefore handcuffed Plaintiff with his hands "secured in front of his person." (*Id.*). The officer also frisked Plaintiff and read him his *Miranda* rights. (Doc. 59-1 at 8; Doc. 59-3 at 13). However, he did not place Plaintiff in the back of his patrol vehicle and instead allowed him to lean against the front of the vehicle.[5] (Doc. 59-1 at 8; Doc. 59-3 at 19).

Officer Vigil handcuffed Plaintiff at about 11:45 a.m. (Doc. 59-1 at 15; Doc. 59-3 at 15). After he did so, two of Plaintiff's friends—John Pettit and Danny Robinson—arrived at the scene. (Doc. 59-3 at 8). BIA Officers Jerome Mirabal and Nicholas Miller arrived after Mr. Pettit and Mr. Robinson, responding to Officer Vigil's call for backup. (Doc. 59-1 at 8, 15; Doc. 59-3 at 8). Officer Vigil searched the partially fenced enclosure while Officers Mirabal and Miller kept watch

---

[5] Officer Vigil explained that he could not allow Plaintiff to sit inside his patrol vehicle because "that particular K-9 unit is a full-cage K-9 vehicle, so the whole back seat is [his] K-9's partition." (Doc. 59-1 at 8).

over Plaintiff and his friends.[6] (Doc. 59-1 at 8-9, 16). Officer Vigil took photographs of and seized nine marijuana plants growing in the enclosure. (*Id*. at 8-9, 12, 16).

The parties dispute when Officer Vigil removed the handcuffs from Plaintiff. Officer Vigil testified that he took the handcuffs off by 12:30 p.m., when he completed his search of the enclosure. (Doc. 59-1 at 8, 15). Plaintiff, however, testified that Officer Vigil did not remove the handcuffs until between 1:00 p.m. and 1:30 p.m., right before he left. (Doc. 59-3 at 16-17).

### III.  Legal Standards Governing Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If there is a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are

---

[6] Officer Vigil testified that he presented Plaintiff with a consent-to-search form authorizing a search of the partially fenced enclosure, and that Plaintiff signed the form in his presence. (Doc. 59-1 at 8, 13, 15-16). In addition, Defendant attached the form with Plaintiff's signature as an exhibit to its Motion, (Doc. 59-6 at 1), and Plaintiff admitted that the signature "looks like" his. (Doc. 59-3 at 15). Plaintiff, however, testified that he did not "remember signing a consent or anything" and did not know if he signed the form. (*Id.* at 15-16). Plaintiff also testified that he had never seen the form before his deposition, though his counsel interjected that he had provided a copy of the form to Plaintiff prior to the deposition. (Doc. 59-3 at 17). Regardless, the parties' disputes regarding whether Plaintiff signed the consent-to-search form are immaterial because none of Plaintiff's remaining claims challenge the legality of the subsequent search. (*See* Doc. 1 at 5-6).

unsupported by the record." *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden to show the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). But when the movant would bear the burden of proof at trial, its initial summary judgment burden is "intensified," and it must establish all of the essential elements of its claim or defense as a matter of law. *Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015). If the movant meets its initial summary judgment burden, "the burden then shifts to the nonmovant," *Tesone*, 942 F.3d at 994, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks and citations omitted).

## IV. <u>Analysis</u>

As further explained below, the Court first holds that Plaintiff's false imprisonment and false arrest claims against Defendant are cognizable under the FTCA pursuant to the Act's law enforcement proviso. The Court next determines that it will apply New Mexico law to assess the scope of Defendant's liability, if any, for Plaintiff's claims, and that Defendant may rely on state-

law defenses available to law enforcement officers sued personally for false imprisonment or false arrest allegedly committed in the performance of their duties. Finally, the Court finds that Defendant is entitled to summary judgment on Plaintiff's false imprisonment and false arrest claims because Officer Vigil undisputedly had probable cause to restrain and arrest Plaintiff for the federal felony offense of marijuana cultivation before he restrained or arrested Plaintiff.

### A. Plaintiff's FTCA claims are cognizable because they fall under the law enforcement proviso.

As a sovereign, the United States is generally immune from suit unless it consents to be sued. *United States v. Testan*, 424 U.S. 392, 399 (1976), *holding limited on other grounds by United States v. Mitchell*, 463 U.S. 206, 216 (1983). The FTCA gives such consent "by waiving, in 28 U.S.C. § 1346(b), the federal government's sovereign immunity for certain torts committed by federal employees acting within the scope of their employment." *Martin v. United States*, — U.S. —, 145 S. Ct. 1689, 1695 (2025) (quotation marks omitted). The "purpose of the [FTCA is] to waive the Government's traditional all-encompassing immunity from tort actions." *Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957).

Nevertheless, the FTCA includes thirteen exceptions to the federal government's waiver of sovereign immunity. *Martin*, 145 S. Ct. at 1695. One of those exceptions is the intentional-tort exception, which "prohibits claims alleging any of 11 enumerated torts," including false imprisonment and false arrest.[7] *Id.* But there is an exception to this exception, known as the law enforcement proviso. *Id.*; *Millbrook v. United States* 569 U.S. 50, 54-55 (2013). This proviso indicates that the intentional-tort exception does not apply to "acts or omissions of investigative

---

[7] The eleven enumerated torts in the intentional-tort exception are "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, [and] interference with contract rights." 28 U.S.C. § 2680(h).

or law enforcement officers of the United States Government" that give rise to a claim for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h). The law enforcement proviso defines an "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* "[I]f a plaintiff alleges that a federal law enforcement officer committed one or more of [the enumerated] six torts, the proviso will ensure those claims survive an encounter with the intentional-tort exception." *Martin*, 145 S. Ct. at 1695.

Here, it is undisputed that Plaintiff's claims for false imprisonment and false arrest arise out of the alleged conduct of Officer Vigil and that Officer Vigil was acting as an investigative or law enforcement officer within the meaning of the FTCA. (Doc. 1; Doc. 59 at 10; Docs. 61, 65); *see also Garvais v. United States*, Civ. No. 03-290, 2007 WL 1724956, at *9 (E.D. Wash. June 11, 2007) ("BIA officers are law enforcement officers as defined by the FTCA, as they are 'empowered by law to execute searches, to seize evidence, or make arrests for violations of Federal law.'") (quoting 28 U.S.C. § 2680(h)); *see also* 25 U.S.C. § 2803(2), (3) (permitting Secretary of the Interior to authorize BIA employees to execute warrants and make arrests for violations of federal law). Thus, Plaintiff's claims are cognizable under the law enforcement proviso of the FTCA.

**B. The Court will apply New Mexico law to determine the scope of Defendant's liability, if any, for Plaintiff's FTCA claims.**

If a court determines that a claim is cognizable under the FTCA, it must next identify the law governing the scope of the United States' liability, if any. The FTCA provides that courts should apply "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Ewell v. United States*, 776 F.2d 246, 248 (10th Cir. 1985) ("To determine the liability of the federal government under the FTCA, it is necessary to apply the law of the place where the

alleged [tort] occurred."). This requires "application of the whole law of the State where the act or omission occurred," including the state's choice-of-law provisions. *Richards v. United States*, 369 U.S. 1, 11 (1962). In other words, "[a]pplying the state's 'whole law' requires that [courts] look to whatever law, including federal law, the state courts would apply in like circumstances." *Charles v. United States*, 15 F.3d 400, 403 (5th Cir. 1994); *Caban v. United States*, 728 F.2d 68, 72 (2nd Cir. 1984).

Although the events giving rise to this suit occurred on the Picuris Pueblo, the parties in their briefing assume that the law of the place is the law of the State of New Mexico, the state in which the Pueblo is located. (*See generally* Docs. 59, 61, 65). The parties' assumption is a plausible one. True, some district courts have found that tribal law was the law of the place where the incident giving rise to an FTCA claim occurred on tribal land. *See Cheromiah v. United States*, 55 F. Supp. 2d 1295, 1301-05 (D.N.M. 1999); *Harvey v. United States*, Civ. No. 08-107, 2009 WL 10698378, at *8-*9 (D.N.M. Sept. 29, 2009); *Williams v. United States*, Civ. No. 99-17, 1999 WL 33320440, at *2-*4 (W.D.N.C. Oct. 15, 1999), *aff'd on other grounds,* 242 F.3d 169 (4th Cir. 2001); *cf. Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072, 1101-04 (S.D. Cal. 2008) (holding that tribal law would apply to FTCA claim "if a private person would be held liable under [tribal] law for engaging in the acts alleged," but ultimately applying state law because plaintiff relied on pertinent tribal law solely to support duty element of state-law negligence claim). However, the courts in those cases based their findings on fact-dependent analyses not entirely applicable here, and also appear to be outliers. *See LaFromboise v. Leavitt*, 439 F.3d 792, 794 (8th Cir. 2006) (collecting cases in which district courts reached a contrary conclusion); *see also, e.g., Fed. Express Corp. v. United States*, 228 F. Supp. 2d 1267, 1269 (D.N.M. 2002) (holding that state law applied to FTCA claim where alleged tort occurred on tribal land within a state); *Ray v. United*

*States*, Civ. No. 19-705, 2021 WL 3472630, at *2-*3 (D.N.M. Aug. 6, 2021) (same); *see also Bryant v. United States*, 565 F.2d 650, 651-54 (10th Cir. 1977) (applying state law without discussion in FTCA suit arising out of incident on tribal land within a state).

Three reasons further support the parties' consensus that state rather than tribal law should apply here. "First, the plain meaning of the statute—'*the* law of *the* place'—indicates that Congress contemplated a single source of governing law." *LaFromboise*, 439 F.3d at 794 (emphases in original). "Understanding 'place' to mean 'State,' where an act or omission occurs within a State, is consistent with the statute's use of the singular." *Id.* In contrast, interpreting this provision to encompass tribal as well as state law "creates tension with the text, because it envisions that the laws of two places, the State and the tribal reservation, might be applicable." *Id.* Moreover, the FTCA provides no "guiding principle to determine which law governs when a State and a tribal court have concurrent jurisdiction."[8] *Id.*

Second, the United States Supreme Court and federal courts of appeals have consistently construed Section 1346(b)'s reference to "the law of the place" to mean the law of the state when the alleged tort occurred in "a federal enclave … located within the territory of a State." *Id.* (collecting cases). Those cases are analogous to FTCA cases arising out of an incident on tribal land because "the federal government … has civil authority over the land" in a federal enclave, as a tribal entity has civil authority over tribal land. *Id.*

---

[8] In their briefing on Defendant's Motion, the parties do not discuss whether the Pueblo would have jurisdiction over Plaintiff's tort claims if brought against a private party where Plaintiff is not a member of the Pueblo or any other tribe, and Officer Vigil's tribal affiliation, if any, is not disclosed. (Doc. 1 at 1; Doc. 59-3 at 20; *see generally* Docs. 59, 61, 65). Moreover, determining whether the Pueblo would have jurisdiction over such claims involves a relatively complex analysis, and on the present record the Court cannot predict what the likely result of that analysis would be. *See generally, e.g., Nevada v. Hicks*, 533 U.S. 353 (2001); *Strate v. A-1 Contractors*, 520 U.S. 438 (1997). Thus, the Court does not address whether the Pueblo would in fact have concurrent jurisdiction over Plaintiff's claims if brought against a similarly situated private party.

Third, applying tribal law in FTCA cases involving tribal land would risk subjecting the United States to excessively varying and unpredictable degrees of liability. *Id.* There are currently over 570 federally recognized tribes in the United States. *See* 89 Fed. Reg. 944 (Jan. 8, 2024) (listing 574 federally recognized tribal entities). The Court is doubtful that Congress intended to subject the United States to liability under the FTCA according to the various laws of hundreds of sovereign tribes.

> In the District of New Mexico alone, for example, there are great differences between the many tribes and their approaches to legal issues. In some instances, the difficulty in proving the existence and substance of any tribal law on the subject of the tort would be considerable. The Court does not believe Congress intended such a result when adopting the FTCA.

*Louis v. United States*, 54 F. Supp. 2d 1207, 1210 n.5 (D.N.M. 1999). For all of these reasons, the Court will apply New Mexico law as the law of the place in assessing Plaintiff's false imprisonment and false arrest claims under the FTCA.

### C. Defendant may rely on state-law defenses available to law enforcement officers sued personally for torts allegedly committed in the performance of their duties.

Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Nevertheless, "the United States is seldom situated identically to private parties," *id.*, and by their plain meaning, "the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*." *United States v. Olson*, 546 U.S. 43, 46 (2005) (emphasis in original). Thus, "the 'like circumstances' inquiry requires only that the United States be analogized to a similarly situated private party." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004) (quotation marks omitted); *see also*

*Robertson v. United States*, 144 F.4th 610, 614 (4th Cir. 2025) ("'Like circumstances' should not be construed so narrowly that no private comparator exists.").

The analogy the Tenth Circuit described in *Hill* extends not only to the state-law causes of action a plaintiff could assert against "a similarly situated private party," but also to any state-law defenses such a party could raise. *See Hill*, 393 F.3d at 1117-18 (holding that United States was entitled to assert state-law statutory defense available to similarly situated private parties because to hold otherwise would be to "render it liable … where private parties would not be"); *Cox v. United States*, 881 F.2d 893, 895 (10th Cir. 1989) ("Under the FTCA, if a private person would be shielded from liability … the United States must also be shielded."); *Ewell*, 776 F.2d at 249 ("[I]mmunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances."). However, the United States may not rely on immunities available only to state or local governments or officials. *See United States v. Muniz*, 374 U.S. 150, 164 (1963) (declining to apply "restrictive state rules" granting immunity to state and local jailers to FTCA suits by federal prisoners); *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955) (noting that FTCA's waiver of sovereign immunity would be "self-defeating" if it "covertly embed[ed]" municipal immunities from tort liability); *Ewell*, 776 F.2d at 249 ("[I]mmunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA.").

The parties here do not dispute that, under New Mexico law, a private party similarly situated to Defendant could be sued for false imprisonment and false arrest, and that Plaintiff may therefore assert these state-law causes of action under the FTCA. (*See generally* Docs. 59, 61, 65). In addition, Defendant maintains, and Plaintiff does not dispute, that Defendant may rely on the state-law defenses that would be available to a law enforcement officer sued personally—*i.e.*, as a

private party—for these torts, most particularly the defense of probable cause. (*Id.*) In other words, they concur that the analogous similarly situated private party is a law enforcement officer sued personally for the state-law torts of false imprisonment and false arrest.

The parties' consensus on this point is consistent with the Tenth Circuit's decision in *Mengert v. United States*, 120 F.4th 696 (10th Cir. 2024). At issue in *Mengert* was a plaintiff's FTCA claims for false arrest and intentional infliction of emotional distress arising out of federal Transportation Security Officers' ("TSOs") detention and search of the plaintiff in Oklahoma. *See generally id.* Under Oklahoma law, a "defendant-officer" commits the tort of false arrest when he unlawfully restrains an individual's personal liberty or freedom of locomotion. *Id.* at 715, 717. But "a finding of probable cause" renders the restraint "legally justified" and defeats the claim. *Id.* at 717. In *Mengert*, the district court granted summary judgment in the United States' favor on the plaintiff's false arrest claim because, "viewing the facts in a light most favorable to [the plaintiff], there is no way to view the actual detention or confinement of plaintiff as unlawful." *Id.* at 715 (brackets omitted). The Tenth Circuit agreed, noting that the at-issue detention and search were legally justified pursuant to the TSOs' "broad authority" to screen airline passengers. *Id.* at 715-17.

In *Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009), the Fifth Circuit discussed its rationale for reaching a similar conclusion. At issue in *Villafranca* were claims for assault and negligence arising out of federal Drug Enforcement Administration ("DEA") agents' arrest of the plaintiff. *Id.* at 259-60. The parties disputed whether the United States could rely on a state-law statutory privilege allowing a peace officer to use force to make an arrest if the officer reasonably believed the force was necessary and the arrest was lawful. *Id.* at 261-62. The *Villafranca* court concluded that the United States could rely on this privilege. *Id.* at 262-64. In so holding, the court

rejected analogizing a federal officer's conduct to that of a private citizen effectuating a citizen's arrest, reasoning that "[t]o hold otherwise would lead to the absurd result that all federal arrests would subject the Government to tort liability under the FTCA absent a finding that the Government's actions conformed with the state's specific law regarding 'private person' arrests." *Id*. at 264.

Importantly, however, the *Villafranca* court limited its holding to state-law *privileges* available to police officers and indicated that state-law *immunities* would still be unavailable to the United States under the FTCA. *Id*. at 263-64. The court reasoned that

> [t]he distinction turns on the qualitative difference between an immunity and a privilege. Unlike an immunity, which affects liability but does not diminish the tort, a privilege protects the actor from a finding of tortious conduct. Put another way, an immunity insulates an individual from liability for public policy reasons, even when that individual has engaged in conduct that would otherwise be actionable. By contrast, a privilege recognizes that, because of the nature of their duties, some public officers may perform certain acts that might otherwise be tortious if committed by someone not having those duties.

*Id*. at 263 (citation omitted). The Court finds the reasoning in *Villafranca* to be persuasive and consistent with the Supreme Court and Tenth Circuit precedent discussed above, and therefore concludes that Defendant may rely on state-law non-immunity defenses available to law enforcement officers sued personally for state-law torts allegedly committed in the performance of their duties.[9]

As a final point regarding the claims and defenses available to the parties, the Court notes that in *Mengert*, the Tenth Circuit relied on state law to identify applicable tort claims and defenses, but federal law to determine the lawful authority of the federal officers whose conduct gave rise

---

[9] Notably, however, it does not appear that the Court's ultimate ruling on Defendant's Motion would be any different if the Court were to limit Defendant's defenses to the state-law defenses available to a non-law enforcement officer because "consistent" standards govern the lawfulness of a citizen's and a law enforcement officer's warrantless arrest under New Mexico law. *New Mexico v. Johnson*, 1996-NMSC-075, ¶ 15, 930 P.2d 1148, 1153.

to the litigation.[10] 120 F.4th at 715-17; *see also Tinkler v. United States*, 982 F.2d 1456, 1466 (10th Cir. 1992) (noting that, although state law provided "the basic framework of tort law standards," "federal statutes and regulations prescribe[d] important duties" of the FAA employee whose conduct gave rise to the litigation). This common-sense approach is consistent with the plain meaning of the phrase "like circumstances" where, as in *Mengert*, state law makes the scope of a defendant's lawful authority relevant to a claim or defense. In addition, the approach avoids the absurd result of exposing the United States to tort liability for acts that federal law authorized or even required its employees to perform, unless state law authorized or required the acts as well. Thus, the Court will rely on New Mexico law to identify and define the causes of action available to Plaintiff and the non-immunity defenses available to Defendant, but federal law to assess Officer Vigil's lawful authority as a BIA officer insofar as that authority is relevant to the parties' state-law claims and defenses.

### D. Defendant is entitled to summary judgment on Plaintiff's false imprisonment and false arrest claims.

Under New Mexico law, a person commits the tort of false imprisonment by intentionally confining or restraining another without consent and with knowledge that he has no lawful authority to do so. *Romero v. Sanchez*, 1995-NMSC-028, ¶ 13, 895 P.2d 212, 215; *Gonzales v. City of Carlsbad*, No. A-1-CA-40943, 2025 WL 1652060, at *4 ¶ 11 (N.M. App. June 11, 2025). The tort of false arrest, in turn, "is merely one way of committing false imprisonment." *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 12, 173 P.3d 6, 10, *cert. denied sub nom. Santillo v. Carter*, 2007-NMCERT-011, 173 P.3d 763. Specifically, "[f]alse arrest involves the unlawful arrest of a person while false imprisonment" more generally "involves the unlawful interference

---

[10] Specifically, in *Mengert*, the courts determined that federal law gave the TSOs who allegedly falsely arrested the plaintiff the authority to screen passengers and property to be carried aboard passenger aircraft, and to seize passengers in order to conduct such searches. 120 F.4th at 715 (citing 49 U.S.C. § 44901(a)).

with the personal liberty or freedom of locomotion of another." *Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002).

"An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." *Santillo*, 2007-NMCA-159, ¶ 12, 173 P.3d at 10.

> There is no claim for false arrest when the facts available to a detaining officer would warrant a person of reasonable caution to believe the detention is appropriate. In other words, the inquiry on a false arrest claim is whether the officer had a reasonable basis for the detention.

*Holmes v. Town of Silver City*, 826 F. App'x 678, 681 (10th Cir. 2020) (quoting *Romero*, 1995-NMSC-028, ¶ 13, 895 P.2d at 215) (quotation marks, brackets, and citation omitted).

New Mexico law is not entirely settled regarding which party bears the burden of proving the presence or absence of probable cause in a civil suit for false imprisonment or false arrest. In *New Mexico v. Johnson*, 1996-NMSC-075, 930 P.2d 1148, the New Mexico Supreme Court stated that "a common-law defense to a civil wrongful arrest or a false imprisonment suit … requires … that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." *Id.* at ¶ 16, 930 P.2d at 1153-54. Likewise, in *Stienbaugh v. Payless Drug Store, Inc.*, 1965-NMSC-033, 401 P.2d 104, the New Mexico Supreme Court intimated that the defendants bore the burden of establishing reasonable cause for the plaintiffs' detention in defending against the plaintiffs' false imprisonment claims. *Id.* at ¶ 4, 401 P.2d at 105-06. The New Mexico Court of Appeals held likewise in *Perea v. Stout*, 1980-NMCA-077, ¶¶ 40-41, 613 P.2d 1034, 1039-40.

However, in *Santillo*, 2007-NMCA-159, 173 P.3d at 6, the New Mexico Court of Appeals observed that "[t]he parties agree that in order for [the p]laintiff to prevail on her claims of false imprisonment [and] false arrest" at the summary judgment stage, "she must show that a factual

18

question exists as to whether [the officer] had probable cause." *Id.* at ¶ 12, 173 P.3d at 10. Similarly, in *Banos v. State of New Mexico*, No. 29,795, 2012 WL 868876 (N.M. App. Feb. 8, 2012), the New Mexico Court of Appeals stated that, "in order for [the p]laintiff to have prevailed on his … state claims for false arrest [and] false imprisonment, [the p]laintiff was required to establish that [the d]efendants lacked probable cause for his arrest." *Id.* at *3; *see also Kerns v. Bader*, 663 F.3d 1173, 1187 (10th Cir. 2011) ("To prove … his [false arrest and false imprisonment] claims, [the plaintiff] acknowledges he must establish that his arrest and detention were without probable cause."). But the Court need not resolve this apparent discrepancy, because even if Defendant bears the burden of proving that Officer Vigil had probable cause and thus bears an "intensified" burden on summary judgment, *Donner*, 778 F.3d at 876, it has met that burden here.

    As noted above, a person commits false imprisonment by confining or restraining another, and false arrest by arresting another, intentionally, without consent, and with knowledge that he has no lawful authority to do so. *Romero*, 1995-NMSC-028, ¶ 13, 895 P.2d at 215; *Gonzales*, 2025 WL 1652060, at *4 ¶ 11. For purposes of the present Motion, Defendant does not dispute that Officer Vigil intentionally restrained and arrested Plaintiff without consent. (*See* Docs. 59, 65). Moreover, viewing the record evidence and drawing all reasonable inferences in Plaintiff's favor, a reasonable factfinder could certainly conclude that Officer Vigil restrained and arrested Plaintiff without consent when he: (1) directed Plaintiff to accompany him to his patrol vehicle; (2) placed Plaintiff in handcuffs, frisked him, and read him his *Miranda* rights; and, (3) kept Plaintiff restrained in front of the patrol vehicle for up to an hour and forty-five minutes. (*See* Section II., *supra*); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized'" when "a reasonable person would have believed that he was not free to leave."); *New Mexico v.*

*Garcia*, 2009-NMSC-046, ¶¶ 36-40, 217 P.3d 1032, 1042–43 (same); *Donahue v. Wihongi*, 948 F.3d 1177, 1187 n.12 (10th Cir. 2020) ("The use of firearms, handcuffs, and other forceful techniques generally … enter the realm of an arrest."); *New Mexico v. Werner*, 1994-NMSC-025, ¶¶ 13, 16, 871 P.2d 971, 973-74 ("[T]o evaluate whether an investigatory seizure is invasive enough to constitute an arrest," courts must consider "the totality of the circumstances," including "the length of time of detention, the place of detention, and the restriction on [the detainee's] freedom of movement.").

Nevertheless, Defendant maintains that it is entitled to summary judgment on Plaintiff's false imprisonment and false arrest claims because Officer Vigil had probable cause to restrain and arrest Plaintiff. (Docs. 59, 65). If so, this would render any factual disputes regarding whether Officer Vigil restrained and arrested Plaintiff immaterial, because under New Mexico law probable cause would absolve Officer Vigil of any liability for false imprisonment or false arrest. *Holmes*, 826 F. App'x 681; *Romero*, 1995-NMSC-028, ¶ 13, 895 P.2d at 215-16; *Santillo*, 2007-NMCA-159, ¶ 12, 173 P.3d at 10. And indeed, as explained below, the Court agrees that Defendant is entitled to summary judgment on Plaintiff's false imprisonment and false arrest claims because, in light of the undisputed record evidence, Officer Vigil had probable cause to believe Plaintiff was committing a federal crime before he restrained and arrested Plaintiff.

As a preliminary matter, the Court must consult New Mexico choice-of-law principles to determine what law a New Mexico court would apply in analyzing the defense of probable cause to arrest. (*See* Section IV.B., *supra*). "When analyzing a state constitutional provision with a federal analogue," New Mexico law requires courts to employ the "interstitial approach." *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836, 844. Pursuant to this approach, courts

> must first examine whether an asserted right is protected under an equivalent
> provision of the United States Constitution. If the right is protected, then, under the

New Mexico Constitution, the claim is not reached. If the right is not protected, then the Court must determine whether flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics require a divergence from established federal precedent in determining whether the New Mexico Constitution protects the right.

*Id.* (citations and quotation marks omitted).

The parties have not cited, and the Court has not located, any decision in which a New Mexico court has applied the interstitial approach to a law enforcement officer's defense of probable cause in a civil suit for false imprisonment or false arrest. (*See generally* Docs. 59, 61, 65.) However, New Mexico courts have used the interstitial approach in civil as well as criminal cases in which a party has raised a state constitutional claim or defense. *Compare, e.g.*, *Morris*, 2016-NMSC-027, 376 P.3d at 836 (using interstitial approach to analyze plaintiffs' state constitutional claims) *and New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, 975 P.2d 841 (same) *with New Mexico v. Yazzie*, 2016-NMSC-026, 376 P.3d 858 (using interstitial approach to analyze criminal defendant's state constitutional defense) *and New Mexico v. Sanchez*, 2015-NMSC-018, 350 P.3d 1169 (same). In addition, the lawfulness of a restraint or arrest based on probable cause does arise out of overlapping federal and state constitutional provisions prohibiting arrests in the absence of such grounds. *See Yazzie*, 2016-NMSC-026, ¶ 17, 376 P.3d at 862 ("The United States and the New Mexico Constitutions provide overlapping protections against unreasonable … seizures.") (citing U.S. Const. amend. IV; N.M. Const. art. II, § 10) (brackets omitted). Moreover, in his response, Plaintiff cites to cases discussing both constitutional provisions in arguing that Officer Vigil's actions were unlawful. (*See* Doc. 61 at 3-5). Thus, the Court will assume without deciding that the interstitial approach applies and will consider caselaw

interpreting both the Fourth Amendment and Article II, Section 10 of the New Mexico Constitution.[11]

Applying New Mexico's interstitial approach, Officer Vigil undisputedly had probable cause to arrest Plaintiff before he directed Plaintiff to his patrol vehicle, handcuffed and frisked him, and read him his *Miranda* rights. Under the Fourth Amendment, a warrantless arrest is lawful when the arresting officer has probable cause to believe that the arrestee has committed or is committing a crime. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (brackets and quotation marks omitted).

> Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that the person … was involved in the crime.

*Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (quotation marks omitted). Although it "must be anchored in a substantial probability—as opposed to a bare suspicion—that an offense took or is taking place," probable cause "is not a high bar." *Hinkle*, 962 F.3d at 1220 (quotation marks omitted). Rather, "[o]fficers need only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quotation marks omitted).

Article II, Section 10 of the New Mexico Constitution has been construed to provide somewhat broader protection than the Fourth Amendment in this context. Specifically, for a warrantless arrest to be lawful under Article II, Section 10, not only must the arresting officer have probable cause to believe that the arrestee has committed or is committing a crime, but also there

---

[11] However, the Court will not consider whether to extend the protections of the New Mexico Constitution further than New Mexico precedent has already done, because neither party has attempted to meet the burden to explain why the Court should do so. (*See* Doc. 61); *see Morris*, 2016-NMSC-027, ¶ 19, 376 P.3d at 844 ("[T]he burden is on the party seeking relief under the state constitution to provide reasons for interpreting the state provisions differently from the federal provisions when there is no established precedent.").

must be some "exigency" that precludes the officer from securing a warrant. *New Mexico v. Paananen*, 2015-NMSC-031, ¶ 19, 357 P.3d 958, 963; *Campos v. New Mexico*, 1994-NMSC-012, ¶ 14, 870 P.2d 117, 121 (emphasis added). As under the Fourth Amendment, probable cause under Article II, Section 10 "exists when the facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 12, 350 P.3d 1234, 1241. Regarding the additional requirement of exigency, in turn, "[i]f an officer observes the person arrested committing a felony, exigency will be presumed." *Campos*, 1994-NMSC-012, ¶ 14, 870 P.2d at 121.

Here, it is undisputed that before the alleged arrest: (1) Officer Vigil smelled and saw marijuana plants growing in the partially fenced enclosure; (2) Officer Vigil saw Plaintiff standing close to the enclosure; and, (3) Plaintiff admitted to Officer Vigil that he was growing marijuana. (*See* Section II., *supra*). It is also undisputed that as a BIA officer, Officer Vigil was authorized to enforce federal law, under which it is a felony to grow marijuana. 21 U.S.C. § 812(c), Schedule I(c)(10); 21 U.S.C. §§ 802(15), (22), 841(a)(1), (b)(1)(D). And although New Mexico has legalized this act under certain conditions, "[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law" regarding the legality of marijuana cultivation, "federal law shall prevail."[12] *Gonzales v. Raich*, 545 U.S. 1, 29 (2005); *see also Feinberg v. Comm'r of Internal Revenue*, 916 F.3d 1330, 1333 (10th Cir. 2019) ("Despite its legality in many states,

---

[12] In *Martin*, the United States Supreme Court held that the Supremacy Clause does not supply an independent defense to a FTCA claim when the United States can show that its employee's conduct "had some nexus with furthering federal policy and complied with the full range of federal law." *Martin*, 145 S. Ct. at 1700-02 (quotation marks and brackets omitted). Here, however, Defendant relies on the state-law defense of probable cause, using the Supremacy Clause only to show the continuing validity of the federal criminal law Officer Vigil had probable cause to enforce. Plaintiff does not argue, and the Court does not believe, that *Martin* can be stretched so far as to implicitly overrule *Gonzales v. Raich*, 545 U.S. 1 (2005), to hold that federal officers may not enforce federal laws criminalizing marijuana cultivation without subjecting the United States to tort liability under the FTCA. (*See generally* Doc. 61).

marijuana is still a schedule I controlled substance under federal law.") (quotation marks omitted). In these circumstances, any reasonable factfinder would conclude that the facts known to Officer Vigil were sufficient to warrant a person of reasonable caution to believe that Plaintiff was committing a federal crime and that Officer Vigil therefore had probable cause to arrest him. In addition, because Plaintiff undisputedly admitted to committing a federal felony in the officer's presence, New Mexico law presumes the exigency required to support a warrantless arrest. *Campos*, 1994-NMSC-012, ¶ 14, 870 P.2d at 121.

In arguing that Officer Vigil nevertheless wrongfully restrained and arrested him, Plaintiff claims that only after entering onto Plaintiff's land and approaching and speaking to Plaintiff "did Officer Vigil arguably develop[] probable cause to arrest given [Plaintiff's] admission that he was growing" marijuana; and, this "admission … was directly contingent upon" Officer Vigil's alleged preceding violation of Plaintiff's constitutional rights by entering onto Plaintiff's property and initiating a conversation with him based on a hunch rather than reasonable suspicion. (Doc. 61 at 1, 4). Plaintiff adds that "[s]ubsequent probable cause for arrest does not rectify the initial constitutional breach." (*Id.* at 5). Plaintiff's argument, however, is fatally flawed in four respects.

First, as a matter of law, Officer Vigil did not violate Plaintiff's constitutional rights by entering onto Plaintiff's property to turn around in his driveway, because the portion of the driveway in which Officer Vigil turned around was not within the curtilage of Plaintiff's residence. "[T]he Fourth Amendment does not track property law" and does not protect property outside the curtilage of a residence from trespass. *Rieck v. Jensen*, 651 F.3d 1188, 1191-93 (10th Cir. 2011). "Curtilage" refers to "the area immediately surrounding and associated with the home." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quotation marks omitted). To determine whether an area falls within curtilage, courts consider four factors: (1) "the proximity of the area … to the home"; (2)

"whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and, (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Thus, for example, in *United States v. Vasquez*, the Tenth Circuit found that a shared driveway close to a home was nevertheless not within the home's curtilage where no enclosure surrounded it, no structure obstructed the public from viewing it, and there was no objective evidence to suggest that it was used for "intimate activity associated with the sanctity of a man's home and the privacies of life." No. 22-1294, 2024 WL 34132, at *2 (10th Cir. Jan. 3, 2024) (quotation marks omitted); *see also Rieck*, 651 F.3d at 1193–94 (holding that end of driveway "abutting and clearly visible from a public highway" did not fall within home's curtilage).

Under state law, in turn, a court's analysis of whether Article II, Section 10 protects an area from trespass focuses not on the label attached to the area, but rather on the test Justice Harlan summarized in his concurring opinion in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Specifically, the New Mexico Supreme Court has held that Article II, Section 10 protects the privacy of a person's property if, first, the person "exhibited an actual expectation of privacy" in it, and second, "the expectation [is] one that society is prepared to recognize as reasonable." *New Mexico v. Crane*, 2014-NMSC-026, ¶ 18, 329 P.3d 689, 694–95; *see also New Mexico v. Adame*, 2020-NMSC-015, ¶ 26, 476 P.3d 872, 879–80.

With respect to Officer Vigil's entry into Plaintiff's driveway, it is undisputed that Officer Vigil merely entered the driveway, backed out, and drove away in the opposite direction. (*See* Section II., *supra*). It is also undisputed that the entrance to the driveway was not fenced or gated, abutted an open field, and was not particularly close to Plaintiff's residence. (*Id.*) Nor is there any record evidence to indicate that Plaintiff used the driveway for any intimate or private activity. In

these circumstances, any reasonable factfinder would conclude that the part of the driveway Officer Vigil used to turn around was not within the curtilage of Plaintiff's residence under the Fourth Amendment. *Rieck*, 651 F.3d at 1193–94; *Vasquez*, 2024 WL 34132, at *2. In addition, any reasonable factfinder would conclude that Article II, Section 10 did not protect this part of the driveway from governmental incursions because Plaintiff did not exhibit an actual expectation of privacy in it, and any expectation of privacy he may have had was not reasonable. Thus, under New Mexico's interstitial approach and as a matter of law, Officer Vigil did not violate Plaintiff's constitutional rights by turning around in his driveway, even if he lacked reasonable suspicion or probable cause to do so.

Second, under the interstitial approach, Officer Vigil did not violate Plaintiff's constitutional rights by exiting his patrol vehicle and walking into Plaintiff's field. Under federal law, "an open field is neither a house nor an effect," and an officer's entry into an open field "is not one of those unreasonable searches proscribed by the text of the Fourth Amendment." *Dunn*, 480 U.S. at 303–04 (quotation marks omitted). Consequently, "the police can enter open fields at any time for investigative purposes without violating the Fourth Amendment." *United States v. Hatfield*, 333 F.3d 1189, 1198 (10th Cir. 2003).

Similarly, under state law, an "open field" is "[a]mong the recognized exceptions to the warrant requirement." *New Mexico v. Leticia T.*, 2014-NMSC-020, ¶ 11, 329 P.3d 636, 639. And although the New Mexico Court of Appeals has acknowledged "the *possibility* that differences in custom and terrain" in New Mexico could give rise to distinct expectations of privacy in rural areas, it has nevertheless "declin[ed] to reach the question of whether [the] state constitution calls for an inquiry into the reasonable expectation of privacy in undeveloped lands beyond curtilage." *New Mexico v. Castaldi*, No. A-1-CA-39554, 2023 WL 5015986, at *2 n.4 (N.M. App. Aug. 7,

2023) (emphasis in original) (quotation marks and ellipsis omitted), *cert. denied*, 2023-NMCERT-010, 547 P.3d 103. Moreover, the state appellate court has found that an individual did not have a constitutionally protected privacy interest in plots of land where he "placed no signs declaring the property to be private property or declaring the land to be off-limits to trespassers" and "did not erect any substantial fences around the plots," and "law enforcement officers were able to walk up and view the plots unimpeded from a public road." *New Mexico v. Sutton*, 1991-NMCA-073, ¶ 26, 816 P.2d 518, 524, *holding modified on other grounds by New Mexico v. Gomez*, 1997-NMSC-006, ¶ 32, 932 P.2d 1, 10.

Here, it is undisputed that Plaintiff's field was not fenced, there were no signs indicating that it was private property or off-limits to trespassers, and Officer Vigil was able to walk into it unimpeded from a public road. (*See* Section II., *supra*). In these circumstances, any reasonable factfinder would conclude that Plaintiff had no constitutionally protected privacy interest in the field under either the Fourth Amendment or Article II, Section 10 of the New Mexico Constitution. *Dunn*, 480 U.S. at 303–04; *Sutton*, 1991-NMCA-073, ¶ 26, 816 P.2d at 524. Thus, under New Mexico's interstitial approach and as a matter of law, Officer Vigil did not violate Plaintiff's constitutional rights by walking into the open field, even in the absence of reasonable suspicion or probable cause.

Third, Defendant has shown that Officer Vigil undisputedly did not restrain Plaintiff in any way when he approached Plaintiff and asked him what he was growing. (*See generally* Doc. 61). And even if Defendant had not made such a showing, any factual disputes on this point would be immaterial because Officer Vigil had reasonable grounds to initiate a brief investigative detention at that time as a matter of law. *Holmes*, 826 F. App'x at 681. Under the Fourth Amendment, a brief investigative detention is justified if specific and articulable facts give rise to a reasonable

suspicion that the person being detained has committed or is committing a crime. *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009). Under this standard, "[t]he likelihood of criminal activity need not rise to the level required for probable cause" and may fall "considerably short of satisfying a preponderance of the evidence standard." *Mocek v. City of Albuquerque*, 813 F.3d 912, 923 (10th Cir. 2015). Rather, "[a]s long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention." *United States v. Young*, 99 F.4th 1136, 1143 (10th Cir. 2023). Nevertheless, a police officer cannot detain an individual based solely on an "inchoate and unparticularized suspicion or hunch." *Terry v. Ohio,* 392 U.S. 1, 27 (1968) (quotation marks omitted); *Young*, 99 F.4th at 1143.

As for the New Mexico Constitution, although New Mexico courts "have interpreted Article II, Section 10 to provide broader protections against unreasonable search and seizure than the Fourth Amendment in some contexts, [they] have never interpreted the New Mexico Constitution to require more than a reasonable suspicion that the law is being or has been broken" to justify a brief, investigative detention. *Yazzie*, 2016-NMSC-026, ¶ 38, 376 P.3d at 866–67 (citation omitted). Moreover, New Mexico courts "have defined and applied the reasonable suspicion standard in the same way when conducting both Fourth Amendment and Article II, Section 10 analyses." *Id.* at ¶ 38, 376 P.3d at 867. In other words, they have required reasonable suspicion based on "specific articulable facts and the rational inferences that may be drawn from those facts." *New Mexico v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 21, 25 P.3d 225, 233.

Here, it is undisputed that, when Officer Vigil exited his patrol vehicle and walked up into Plaintiff's open field: (1) he smelled and saw marijuana plants growing in the partially fenced enclosure; (2) he saw Plaintiff standing close to the enclosure; and, (3) as a BIA officer, he was authorized to enforce federal law, under which it is a felony to grow marijuana. (*See* Section II.,

*supra*); 21 U.S.C. § 812(c), Schedule I(c)(10); 21 U.S.C. §§ 802(15), (22), 841(a)(1), (b)(1)(D). In these circumstances, any reasonable factfinder would conclude that Officer Vigil was aware of specific, articulable facts giving rise to a reasonable suspicion that Plaintiff was committing a federal crime before he spoke to Plaintiff. Thus, even if the Court were to find genuine factual disputes regarding whether Officer Vigil detained Plaintiff by approaching and asking what he was growing, the disputes would be immaterial because the officer's actions were constitutionally justified as a matter of law.

Fourth and finally, although the New Mexico courts do not appear to have addressed the issue, federal courts have consistently held that the exclusionary rule and the fruit-of-the-poisonous-tree doctrine do not apply in civil litigation. *Shaw v. Schulte*, 36 F.4th 1006, 1017 (10th Cir. 2022) (collecting cases); *Marta v. City of Las Cruces*, Civ. No. 23-192, 2024 WL 2396602, at *8 (D.N.M. May 23, 2024). Thus, even if the Court were to find genuine factual disputes regarding whether Officer Vigil violated Plaintiff's constitutional rights by turning around in Plaintiff's driveway and walking into his open field—which the Court does not, for the reasons already stated—this finding would not resurrect Plaintiff's false imprisonment and false arrest claims because it would not vitiate the fact that Officer Vigil undisputedly had reasonable grounds and probable cause to restrain and arrest Plaintiff before he effected the restraint or arrest.

In sum, under New Mexico law, a false imprisonment or false arrest claim cannot rest on a restraint or arrest supported by probable cause. *Romero*, 1995-NMSC-028, ¶ 13, 895 P.2d at 215–16; *Santillo*, 2007-NMCA-159, ¶ 12, 173 P.3d at 10; *Holmes*, 826 F. App'x at 681. And here, the undisputed record evidence shows that, as a matter of law, Officer Vigil had probable cause to restrain and arrest Plaintiff for the federal felony offense of marijuana cultivation before he

effected the restraint or arrest. Defendant is therefore entitled to summary judgment on Plaintiff's false imprisonment and false arrest claims under the FTCA.

## V.  **Conclusion**

For all of the above reasons, the Court GRANTS Defendant the United States of America's Motion for Summary Judgment (Doc. 59) on: (a) Plaintiff's assault and battery claims because Plaintiff does not oppose Defendant's request for summary judgment on these claims; and, (b) Plaintiff's false imprisonment and false arrest claims because, as a matter of law, Officer Vigil had probable cause to restrain and arrest Plaintiff at the relevant time. The Court's rulings having disposed of all of Plaintiff's remaining claims on the merits, Plaintiff's claims are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent